FILED & ENTERED

SEP 30 2026

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Cetulio DEPUTY CLERK

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re:<br><br>GIOVANNI HERNANDEZ,<br><br>Debtor. | Case No.: 1:24-bk-10532-MB<br><br>Chapter 7<br><br>Adv. No.: 1:24-ap-01033-MB<br><br>**MEMORANDUM OF DECISION AFTER TRIAL** |
| JUAN CARLOS HERNANDEZ,<br><br>Plaintiff,<br><br>v.<br><br>GIOVANNI HERNANDEZ,<br><br>Defendant. | |

## I. INTRODUCTION

This adversary proceeding arises out of the debtor-defendant's failed business venture to grow and sell cannabis. In addition to relying on his own capital, he received funding from Plaintiff (among other sources), which funding the Plaintiff now seeks to have declared a nondischargeable debt. Plaintiff generally alleges that the funding at issue was obtained by fraud and constitutes a debt resulting from a willful and malicious injury. On May 20-21 and June 1, 2026, the Court held a trial in this

adversary proceeding. James Franklin Drake IV of Mendez & Sanchez, A.P.C. appeared on behalf of plaintiff Juan Carlos Hernandez ("Plaintiff"). Defendant Giovanni Hernandez ("Defendant") appeared on his own behalf.

For the reasons set forth below, the Court holds that Plaintiff has failed to meet his burden to establish nondischargeability.

## II. JURISDICTION, ADJUDICATIVE AUTHORITY & VENUE

The Court has jurisdiction over this adversary proceeding because it arises under section 523(a) of the Bankruptcy Code.[1] *See* 28 U.S.C. § 1334(b); *see also* General Order No. 13-05 (C.D. Cal. July 1, 2013), at ¶ 1. Because Plaintiff's operative complaint solely concerns nondischargeability under sections 523(a)(2), (4) and (6), this Court has exclusive jurisdiction. *See* 11 U.S.C. § 523(c)(1); *Rein v. Providian Fin. Corp.*, 270 F.3d 895, 904 (9th Cir. 2001). This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(I) ("Core proceedings include … determinations as to the dischargeability of particular debts").

For the same reasons, the Court has the adjudicative authority to enter final orders in this adversary proceeding. *See Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665 (2015); *Deitz v. Ford (In re Deitz)*, 760 F.3d 1038 (9th Cir. 2014) (authority to adjudicate nondischargeability encompasses authority to liquidate debt and enter final judgment). Venue is proper because the trial was held in the district and division where this chapter 7 case is pending. *See* 28 U.S.C. § 1409(a).

At the conclusion of trial, the Court took this matter under submission. Having considered all admitted testimony and documentary evidence, and having accorded the weight it deems appropriate to such evidence, the Court hereby makes its written findings of fact and conclusions of law. *See* Fed. R. Civ. P. 52(a)(1) (providing that Court shall make findings of fact and conclusions of law after close of evidence in non-jury trial); Fed. R. Bankr. P. 7052 (providing that Fed. R. Civ. P. 52 applies in an adversary proceeding).

---

[1] Unless the context suggests otherwise, a "chapter" or "section" ("§") refers to the Bankruptcy Reform Act of 1978, as amended, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"). A "Rule" refers to the Federal Rules of Bankruptcy Procedure or other federal or local rule, as the context indicates. Other terms shall have the meanings ascribed to them in the Bankruptcy Code, the Rules, or herein.

## III. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Parties and Their Prior History

Plaintiff is a property manager and private driver. Adv. Dkt. 65 at 17:23–24.[2] He has held these occupations for over thirty years. *Id*. at 18:1. Defendant, apart from operating the business at issue in this adversary proceeding, has worked driver and delivery jobs, Adv. Dkt. 66 at 125, 133–34, and from at least January to March of 2024, was an independent salesman at GD Construction, Case Dkt. 1 at 31 (¶ 1).[3]

Plaintiff and Defendant have known each other for approximately twenty years. Adv. Dkt. 65 at 19; Adv. Dkt. 66 at 164, 320–21. According to Plaintiff, their families were close. Adv. Dkt. 66 at 322–23 (Plaintiff stating, "I know them for the last 20 years. I know [*sic*] him, his family. H[e] used to know my mom, my father, my whole family."). According to Plaintiff's friend and neighbor, Gustavo Andres Giraldo, Plaintiff and Defendant were friends. Adv. Dkt. 66 at 16:8–9.

During the relevant time period, Plaintiff was the manager of an apartment building located at 10020 Zelzah Avenue in Northridge, California ("The Liora"). Adv. Dkt. 66 at 15–18, 61, 163–64. Plaintiff lived at The Liora while working there. Adv. Dkt. 66 at 59, 167:16–18. At the beginning of 2021, Defendant moved into an apartment at The Liora. Adv. Dkt. 66 at 61. Defendant shared the apartment with his mutual friend and then-roommate, Jhony Mendoza. Adv. Dkt. 65 at 61–62; Adv. Dkt. 66 at 59–62.

### B. Defendant Formed El Patron LLC, Procured Initial Investors

In 2021, Defendant decided to form a new business called "El Patron," which would engage in the indoor cultivation, manufacturing and distribution of cannabis or marijuana products. In May 2021, Defendant formed El Patron LLC, a California limited liability company, with the assistance of an accountant named Shakeel "Sam" Ahmed. Dkt. 66 at 203–07. El Patron LLC was organized on May

[2] When citing a specific page or pages of a document filed in the bankruptcy case ("Case Dkt.") or the adversary proceeding ("Adv. Dkt."), the Court uses only those page numbers that are generated by CM/ECF and appear in the document's header.

[3] The Court takes judicial notice of Defendant's schedules and all other papers filed in Defendant's bankruptcy case and in this adversary proceeding. *See, e.g., The Golden Gate v. Marincovich,* 286 F. 105, 106 (9th Cir. 1923) ("Every court takes judicial notice of its own records in the same case.").

12, 2021, when Ahmed filed articles of organization with the California Secretary of State. *See* Cal. Corp. Code § 17702.01(d) ("A limited liability company is formed when the Secretary of State has filed the articles of organization."); Adv. Dkt. 62-1 at 61 (Pl. Tr. Ex. 5); Adv. Dkt. 62-2 at 2 (Def. Tr. Ex. A).[4] Thereafter, Defendant obtained an internet domain name for El Patron and had Giraldo, his neighbor at the time, create a company logo. Adv. Dkt. 66 at 8–9.

Defendant was the sole member and manager of El Patron LLC. Adv. Dkt. 66 at 201:6–20, 209:3–10; *see also* Case Dkt. 1 at 12 (¶ 19 of Schedule A/B, containing Defendant's declaration under penalty of perjury that he owned 100% of El Patron LLC). Although the record contains no operating agreement for El Patron LLC, the documentary evidence corroborates Defendant's testimony. *See, e.g.,* Adv. Dkt. 62-2 at 3 (El Patron LLC's statement of information filed with the California Secretary of State), 4 (notice of IRS's issuance of EIN for El Patron LLC, describing Defendant as sole member); Adv. Dkt. 62-1 at 2–3 (promissory note between parties, stating that "[i]f [Defendant] fails to make the full payment …, [Defendant] will turn over the full ownership … of El Patron LLC to [Plaintiff]."). Similarly, witnesses testified that they understood Defendant to be "the one who made the decisions," *see, e.g.*, Adv. Dkt. 66 at 19:23–24, and who maintained the company's operations, *see, e.g.*, Adv. Dkt. 65 at 203:4–13. In terms of financial management, Defendant and his then-roommate, Mendoza, handled "all the payments," i.e., the company's accounts payable and receivable. Adv. Dkt. 66 at 19–20.

[4] At trial, Plaintiff introduced a second document purporting to be Articles of Incorporation for El Patron LLC. *See* Adv. Dkt. 62-1 at 63 (Pl. Tr. Ex. 6). Like Trial Exhibit 5, the document admitted as Trial Exhibit 6 shows a recordation date of May 12, 2021. The only material difference between these documents is the name of the party listed as the agent for service of process. In Trial Exhibit 5, only Defendant is listed. Adv. Dkt. 62-1 at 61. In Trial Exhibit 6, both Defendant and Camilo Correa Stahelin are listed. As best the Court can tell, Plaintiff introduced Exhibit 6 to suggest that Defendant altered the document to somehow induce Stahelin—a non-party to this action—to invest in El Patron LLC. The Court takes judicial notice that Trial Exhibit 6 was not, in fact, recorded with the California Secretary of State. *See* Fed. R. Evid. 201(b)(2), (d); *Gerritsen v. Warner Bros. Ent., Inc.*, 112 F. Supp. 3d 1011, 1033-34 (C.D. Cal. 2015) (taking judicial notice of business entity profile from the California Secretary of State's website); Business Search for "202113710471", Cal. Sec'y of State, https://bizfileonline.sos.ca.gov/search/business (last visited June 20, 2026). Whatever its provenance, the Court is not persuaded by the evidentiary record before it that Defendant altered the document or used it to induce action by anyone, let alone, Stahelin. Defendant testified that before trial, he had never seen Trial Exhibit 6 and had no idea where it came from. Adv. Dkt. 66 at 209–10. The Court finds this testimony credible. Further, the Court notes that any fraudulent inducement of Stahelin, even if demonstrated, would not have established that *Plaintiff* was fraudulently induced in any way.

Defendant secured the financial and management support of two initial investors: Camilo Toledo-Pérez ("Toledo") and Iván Camilo Correa-Stahelin ("Correa"), two individuals from Bogotá, Colombia. Adv Dkt. 65 at 190–92. Although it appears that their involvement started even earlier, on August 25, 2021, Defendant and his initial investors held a meeting on behalf of the business by Zoom teleconference. Adv. Dkt. 62-2 at 113 (meeting minutes). The minutes of the meeting indicate that the attendees discussed El Patron LLC's projected budget, financial strategies, and the investors' commitments and projected distributions. *Id*. Although the record is unclear how much money was actually invested by the Bogota Investors, the parties agreed at this meeting that they each would invest in El Patron LLC as follows: $112,250 from Toledo, $102,750 from Correa, and $100,000 from Defendant. *Id*. The parties further agreed that "[p]rofits after tax" during the first year of operation would be distributed as follows: 25% to Toledo, 25% to Correa, and 50% to Defendant. *Id*. In addition to funding, Correa brought his prior experience growing cannabis in Columbia. Adv. Dkt. 65 at 138:11-16, 142:15-23.

### C. El Patron LLC Leases, Begins Improvements to Growing Facility

From May to June 2021, Defendant, with the assistance of Correa, scoped out potential locations to set up El Patron LLC's operations. *See* Adv. Dkt. 65 at 137–38, 180:18–21. They first looked in the City of Los Angeles but quickly determined that it was "too costly." *Id*. at 137:22–23. They then physically visited potential locations "in cities like Adelanto, Oxnard, and [determined that those cities] were no longer issuing licenses" to cannabis businesses. *Id*. at 137:23–24, 138:3–7. Defendant testified that it "was very hard to find" a place suitable for the business. Adv. Dkt. 66 at 307–08. Eventually, they "went to California City," and were led to believe by city officials that they could "get a license for cultivating and manufacturing" cannabis "in three" or "[f]our months." Adv. Dkt. 65 at 137–38, 181:8–13, 211–12. Defendant then spoke to a realtor, and they settled on a barebones warehouse, one of four located at 22510 Curtiss Place, California City, California 93505 (the "Property"). Adv. Dkt. 66 at 302, 308.

On June 28, 2021, El Patron LLC entered into a two-year lease of the 2,000-square-foot warehouse, Unit B/200 at the Property (the "Facility"). Adv. Dkt. 62-2 at 9–15 (the "Lease"). At the time it was leased, the Facility was in an unfinished state. It was entirely empty, with "no walls," "no

electricity, no plumbing, no insulation, nothing." Adv. Dkt. 65 at 181–82, 183:15–18; Adv. Dkt. 66 at 308:7–21. Apparently, the only thing the Facility had was a slab foundation, exterior walls, some framing, and a roof. *See* Adv. Dkt. 65 at 211; Adv. Dkt. 66 at 303; Adv. Dkt. 62-2 at 102 (composite of six photos depicting the Facility's condition in June to July 2021). Because it was so unfinished, it did not come with a certificate of occupancy, a document issued by the city which (a) verifies a building's compliance with applicable building codes and other laws, and (b) allows a building to be used for its intended purpose.

The base rent under the Lease was $5,000 per month, plus a security deposit equal to one month's rent. Adv. Dkt. 62-2 at 9 (§§ 3.A.1, 6.A). The total due to the landlord the day after signing was $10,000. *Id*. at 10 (§ 7.E).[5] The lease stated that El Patron LLC would be responsible for "interior build out and site improvements to [the Facility] … [which] include but [are] not limited to sewer connections, water connections, natural gas connections, electrical connections, fencing and any other site improvements required by the city for certificate of occupancy." *Id*. at 13 (§ 40.2). Further, the "Lease [wa]s contingent upon [El Patron LLC] receiving [a] local conditional use permit for cannabis business activities from … California City. " *Id*. at 13 (§ 40.4).

Defendant signed the Lease on behalf of El Patron LLC. *Id*. at 14. Defendant personally guaranteed payment of all amounts owed under the Lease, including rent, attorney's fees, and any court costs in the event of default by El Patron LLC. *Id*. at 14. On June 29, 2021, Defendant personally paid the $5,000 security deposit owed under the Lease via a cashier's check from his personal account at JP Morgan Chase Bank, N.A. ("Chase"). Adv. Dkt. 62-2 at 16. He similarly paid the $2,500 rent for September of 2021 from his personal Chase account. *Id*. at 18.

Right away, Defendant set out to improve the Facility with "7 grow rooms, [a] storage room, [an] office, [and a] bath[room]." *See* Adv. Dkt. 62-2 at 89 (project description); Adv. Dkt. 66 at 309:7–8. Defendant began the process of hiring contractors and laborers to "do the wir[ing], the plumbing, [and] the electrical," including installing a panel to connect the main power line to the Facility. Adv. Dkt. 66

[5] For the second and third months, the rental rate was reduced to $2,500 to allow for build out of the space and the local permitting process. *Id*. at 13 (§ 40.4)

at 308. They also installed brand-new air-conditioning equipment suitable for the operations. Adv. Dkt. 66 at 21, 309:8.

In addition to basic improvements, Defendant worked on getting the Facility ready for cannabis cultivation. With the assistance of Correa, Defendant obtained two-level racks on which to place the plants. Adv. Dkt. 66 at 308:25; Adv. Dkt. 62-2 at 192–94 (composites of photos depicting racks). In light of anticipated humidity levels in the Facility, they procured and applied a very expensive mold-resistant paint because any mold would "affect the plants." Adv. Dkt. 66 at 309:1–5.

Defendant and Correa purchased approximately 90 lights for growing operations. Adv. Dkt. 66 at 308:22–25; Adv. Dkt. 62-2 at 192–94 (composites of photos depicting installed lights). They purchased the lamps in Los Angeles with cash provided by Correa. Adv. Dkt. 65 at 180. Because of the intensity of the lights and the heat produced by them, Defendant and Correa also purchased and installed several fans to maintain airflow in the grow rooms.[6] Adv. Dkt. 65 at 145:20–23; Adv. Dkt. 66 at 309:6; Adv. Dkt. 62-2 at 192–94 (composites of photos depicting 3-blade fans on floor and walls).

Moreover, Defendant hired Giraldo, and later Mendoza, to install a drip irrigation system for the plants, which required approximately 10 full days of labor and was completed in September of 2022. Adv. Dkt. 66 at 9–10, 53–54; Adv. Dkt. 62-2 at 190–94 (composites of photos depicting drip irrigation lines). After completion of the irrigation system work, Defendant paid off Giraldo in varying installments over the course of a few months. Adv. Dkt. 66 at 55.

All told, Defendant spent "[a]round $400,000" of funds from the company's investors to build out the Facility. Adv. Dkt. 66 at 299, 303.

### D. <u>Despite Numerous Challenges and Delays, Defendant Sets Up The Business</u>

The record is replete with evidence that Defendant was genuinely vexed by bureaucratic procedures and other "red tape" that prevented El Patron LLC from becoming legally operational in the three or four months that he initially believed feasible. Notwithstanding Plaintiff's complaints at trial that there were many delays and that Defendant often made excuses for those delays, the Court is

---

[6] Although Correa assisted with procuring the necessary technology for indoor cultivation, he understood his role to be that of an investor, whereas Defendant "w[as] responsible for" taking care of the plants and maintaining operations. Adv. Dkt. 65 at 203:4–13.

persuaded that these challenges were real, that they were necessitated by Defendant's desire to operate the business legally, and that ultimately Defendant overcame these bureaucratic challenges.

**1. It Took Defendant Over a Year to Obtain California City's Approval**

Despite Defendant and Correa's belief that El Patron LLC could "get a license for cultivating and manufacturing" cannabis from California City "in three" or "[f]our months," Adv. Dkt. 65 at 137–38, 181:8–13, 211–12, the process ultimately took much longer.

In July of 2021, a few weeks after signing the Lease, Defendant completed the requisite fingerprinting and identity verification, and applied to California City's public works department for a cannabis business permit. Adv. Dkt. 62-2 at 38 ("City of California City Cannabis Permit Procedure"), 39–40 (copy of first two pages of application); *see also* Adv. Dkt. 46 at 29–38 (copy of application pages 1–2 and 6–13). Defendant personally paid the requisite $17,000 in fees via cashier's checks made from his personal accounts with Chase and Wells Fargo Bank, N.A. ("Wells Fargo"). Adv. Dkt. 62-2 at 41 (copy of application fee receipt), 42–45 (copies of checks to California City). On July 14, 2021, California City issued a "Zoning Verification Letter," determining that El Patron LLC's proposed cannabis cultivation business was located outside a 1,000-foot radius of any "sensitive use," as required by city ordinance. Adv. Dkt. 62-2 at 93.

On November 15, 2021, Defendant, in his personal capacity as owner and developer of the Facility under the Lease, signed an indemnification agreement with California City. Adv. Dkt. 62-2 at 48–54. The agreement stated that:

> [Defendant] shall defend (with legal counsel chosen by CITY), indemnify, and hold harmless the CITY from and against any and all claims … brought by anyone challenging the validity and/or legality of the [City's permit allowing El Patron LLC to operate a marijuana cultivation business;] the process followed[; and] the legality of [Defendant's] business [and its] operation….

*Id*. at 48–49 (§ 2). Further, Defendant agreed to "pay all costs of defense, including but not limited to, attorneys' fees and costs, City Staff time, and City Attorney time." *Id*.[7]

---

[7] The copy of the indemnification agreement in the record is not countersigned by California City, but the fact that the city presented it to Defendant for his signature, and that Defendant agreed to be bound by its terms, is nonetheless relevant evidence that Defendant went out of his way to meet the city's various demands of his business.

On December 6, 2021, California City issued a "Notice of Local Compliance Underway," which allowed El Patron LLC to begin the process of obtaining the necessary cannabis licenses from the State of California. Adv. Dkt. 62-2 at 46–47. On February 17, 2022, Defendant paid by debit card a total of $1,155 in fees to California City for an application for staff development review and for fire inspections. Adv. Dkt. 62-2 at 94–95.

On March 2, 2022, an inspector with California City's building department inspected and approved of the rough framing (walls/shear panels), insulation, rough mechanical, and rough plumbing improvements at the Facility. Adv. Dkt. 62-2 at 89, 109 (composite of six photos depicting Facility's interior condition in March of 2022).

On January 27, 2022, an inspector with California City's building department inspected and approved the rough electrical improvements at the Facility. Adv. Dkt. 62-2 at 89 (inspection record card), 108 (composite of six photos depicting electrical improvements and inspector's van). The inspector returned on February 3, 2022, inspecting and approving Defendant's underground plumbing improvements at the Facility. *Id*. at 89, 107 (composite of six photos depicting the underground plumbing improvements).

On May 24, 2022, California City's fire department completed its inspection of the Facility, finding no violations. Adv. Dkt. 62-2 at 97–100 (fire inspection report), 111 (composite of two photos depicting at least six fire extinguishers inside the Facility). That same day, California City's building department completed its final inspection and approved of Defendant's improvements to the Facility. *Id*. at 89, 110 (composite of six photos depicting Facility's interior condition on May 24, 2022). On June 8, 2022, California City issued a certificate of occupancy for the Facility. Adv. Dkt. 62-2 at 91.

On July 1, 2022, California City issued to El Patron LLC two renewed business permits: one for cannabis cultivation and one for cannabis distribution. Adv. Dkt. 62-2 at 63, 65. Defendant appears to have paid via check a total of $18,890 in fees to renew the two permits. *Id*. at 64, 66 (copies of carbon transfers of checks); *see also* Adv. Dkt. 46 at 95 (California City's renewal notice regarding to El Patron LLC's cannabis cultivation business permit).

On November 2, 2022, Defendant paid California City another $340 in fees for a site plan review (SPR) application regarding the Facility and for fire inspections. Adv. Dkt. 62-2 at 101. On December

8, 2022, California City's interim city manager and acting planning director approved the SPR application regarding the Facility. Adv. Dkt. 46 at 74–84.

### 2. <u>El Patron LLC Had Difficulties in Reliably Accessing Banking Services</u>

In September or October of 2021, El Patron LLC's deposit account with Chase was summarily closed. *See* Adv. Dkt. 62-2 at 120–41 (El Patron LLC's Chase account statements for July 21 to Oct. 29, 2021), 142 (account closure letter re: Defendant's personal account at Chase). Defendant understood the sudden closure happened because El Patron LLC was engaged in marijuana-related activities, and Chase was unwilling to provide banking services due to potential consequences Chase could face under federal law. *See* Adv. Dkt. 66 at 190–92, 210, 215–19.

After the Chase account closure, Defendant caused El Patron LLC to open an account with Bank of America, N.A ("<u>BofA</u>"). *Id*. at 220; *see also* Adv. Dkt. 62-2 at 143–61 (El Patron LLC's BofA account statements for Sept. 20 to Dec. 31, 2021), 21–31 (various check images and other transaction records concerning El Patron LLC's BofA account). He deposited with BofA a cashier's check from Plaintiff in the amount of $30,000, but BofA held the funds for "almost 20 days," creating a cash crunch because Defendant "had to pay some people." Adv. Dkt. 66 at 220.

On Plaintiff's advice, Defendant caused El Patron LLC to open an account at Wells Fargo. *Id*. Apparently, Plaintiff had some friends who worked at Wells Fargo's Northridge branch, where Plaintiff maintained a personal account, and he believed the business would receive better service there than with Chase or BofA. *See id*. To his credit, Plaintiff was correct; Defendant testified that he "didn't have any issue [getting] a money order for $3,000" in only "like … one day." *Id*. at 220:16–18.

### 3. <u>Defendant Faced Delays But Ultimately Obtained Permission from the State and its Various Agencies</u>

On December 12, 2021, Defendant applied to the California State Water Resources Control Board for waiver of waste discharge requirements for discharges of waste to a community sewer system associated with indoor cannabis cultivation activities. Adv. Dkt. 62-2 at 76–79.

On December 13, 2021, Defendant submitted to the California Department of Fish and Wildlife a self-certification that El Patron LLC's cannabis cultivation project would not substantially modify any river, stream or lake. Adv. Dkt. 62-2 at 80–87.

On January 25, 2022, Defendant paid by check a $2,170 fee to file a specialty indoor cultivation application with the California Department of Cannabis Control, Adv. Dkt. 62-2 at 59, plus a $1,000 fee to file a specialty indoor distributor application, *id*. at 60.

On April 21, 2022, the California Department of Cannabis Control issued to El Patron LLC a provisional adult-use, specialty indoor cannabis distributor license. Adv. Dkt. 62-2 at 58, 61. On April 19, 2022, Defendant paid a $1,500 fee for the distributor license. *Id*. at 60.

On August 2, 2022, the California Department of Cannabis Control issued to El Patron LLC a provisional adult-use, specialty indoor cannabis cultivation license. Adv. Dkt. 62-2 at 56. Defendant paid by check a $19,540 fee for the license. *Id*. at 57.

On August 31, 2022, the Eastern Kern Air Pollution Control District issued an "Authority to Construct" permit to El Patron LLC. Adv. Dkt. 62-2 at 71–73. Defendant paid a total of $689 in permit fees, split across two credit cards. *Id*. at 69–70, 74–75.

* * *

Considering this substantial documentary evidence of Defendant's earnest efforts to operate the business in a lawful manner, the Court finds credible Defendant's repeated testimony that he tried to "do everything legally." *See* Adv. Dkt. 66 at 237:8–12, 246:14, 285:3, 290:5.

**E. <u>Defendant Solicits Plaintiff's Participation in the Business</u>**

The trial record does not establish a comprehensive accounting of all the sources and uses of cash by El Patron LLC. In terms of sources, it does show that Defendant invested $20,000 to $30,000 of his own money to start the business. Adv. Dkt. 66 at 291. It shows that Defendant obtained $75,000 to $100,000 for the business from an individual named Raunaq Anand, with whom Defendant previously worked. *Id*.; Adv. Dkt. 65 at 41:8, 42–46. Although the timeline and amounts are less than clear, the record shows that Plaintiff advanced money to Defendant for use by El Patron LLC.

Plaintiff testified at trial that he began making advances to Defendant for use by El Patron LLC after a dinner in December of 2021, with Defendant and Defendant's sister, Lina, at her Simi Valley home. Adv. Dkt. 65 at 20, 63:10–12. According to Plaintiff, Defendant told him that El Patron "was his dream come true, that he had already [*sic*] experience in cannabis, that he knew how to operate everything, that he had already [*sic*] his business running. He also invited [Plaintiff] to go and see …

where [Defendant] had his business." Adv. Dkt. 65 at 21:1–8. Defendant purportedly explained to Plaintiff that "[h]e was working with [California] City" to obtain permits for the business, that "[t]hey were in process," and that "he was just waiting for" them. Adv. Dkt. 65 at 21:25–22:5. Defendant also purportedly indicated that, at that time, "he ha[d] vendors already waiting for" the cannabis product. *Id*. at 22:14–17.

According to Plaintiff, Defendant asked Plaintiff for an investment of $100,000 to get El Patron LLC up and running. Adv. Dkt. 65 at 22:18–23:1. In return, Defendant allegedly orally promised Plaintiff "twenty percent of … the winnings when he sells" the cannabis product. *Id*. at 23:2–9; 68:13–25. Sometime after the dinner, Plaintiff and his wife visited Defendant's existing cannabis cultivation operation, which was located in California City, California.[8] Adv. Dkt. 65 at 21:9–18. While there, Plaintiff saw Defendant "had plants already there growing up." *Id*. at 21:18.[9]

Later in December of 2021, or January of 2022, Defendant and his then-roommate, Mendoza, prepared "a presentation—a business plan—operational plan and financial strategy" to show Plaintiff. Adv. Dkt. 65 at 60:6–8; Adv. Dkt. 66 at 111:4–8; Adv. Dkt. 62-2 at 164–172 (copy of presentation slides). Defendant actually prepared two versions of the presentation, but the first nine slides of each

---

[8] Plaintiff did not "remember the name of the city," but testified that it was located "two hours north" of the courthouse off "Freeway 14." Adv. Dkt. 65 at 21:13–14. The Court takes judicial notice of the fact that California City is approximately a two-hour drive from the courthouse and is located east of State Route 14. *See* Fed. R. Evid. 201(b)(1), (d) (providing that "at any stage of the proceeding," the court may take judicial notice of "a fact that is not subject to reasonable dispute because it … is generally known within the trial court's territorial jurisdiction.").

[9] Although the Court does not doubt that a dinner took place in December 2021, and that Defendant solicited funds from Plaintiff, the Court did not find Plaintiff's testimony regarding the details of that dinner or Defendant's purported representations credible or reliable. For one thing, it appears that discussions between the parties about an "investment" in El Patron LLC began long before December, i.e., as early as August 9, 2021. More importantly, the documentary evidence admitted at trial shows that Plaintiff started making advances to Defendant in November of that year—well before the dinner took place. *See* Adv. Dkt. 62-1 at 59 (top left photo, cashier's check no. 0069112511 and top right photo, cashier's check no. 0069112546). Furthermore, the Court found Plaintiff's testimony internally inconsistent regarding the status of the business at the time of December 2021 solicitation. *Compare* Adv. Dkt. 65 at 21 (testifying that the business was "already . . . running") *with id.* at 22–23 (testifying that the business needed money "to get [El Patron LLC] up and running….").  Although Plaintiff's testimony suggested that he did not advance funds until after visiting the facility and seeing plants already growing there, the first group of plants were not purchased until September of 2022. *See* Adv. Dkt. 62-2 at 177.

were identical; the text accompanying the tenth and last slide, titled "RETURN INVESTMENTS," was the only difference between the two. Adv. Dkt. 66 at 181:19–182:9.

The two versions contained alternative proposed terms of how El Patron LLC would calculate the return owed on Plaintiff's investment. Adv. Dkt. 66 at 177:1–5, 178:14–23. The first version ("Option A") stated that Plaintiff would receive a return on his investment "in six months after the first harvest paid with in [*sic*] the time frame or sooner." Adv. Dkt. 62-2 at 172. Option A further stated that the return would be "15% interest per 1 month per 1 year," and included a sample calculation of "$30,000 * 15% interest = $4,500 per month." *Id*. In contrast, the second version ("Option B") stated "1,000 plants = 100 pounds * $1,500 = $150,000 * 15% = $22,500 – taxes – operating cost." Adv. Dkt. 66 at 177:14–16.[10]

Defendant sent the presentations to Plaintiff via email, which Plaintiff read, after which Plaintiff met with Defendant and Mendoza to discuss "which deal … was better for [Plaintiff] and for [them]." Adv. Dkt. 65 at 60, 62, 68; Adv. Dkt. 66 at 178:16–179:1, 181:13–17. Defendant testified that after showing Plaintiff the presentation, Plaintiff said, "'Okay. Let's do it.'" Adv. Dkt. 66 at 285:18. According to Defendant, the parties opted to proceed under Option B, i.e., that Plaintiff could receive a lump sum return of up to $22,500 on his investment or loan. Adv. Dkt. 66 at 177:7–9, 184. The parties did not reduce their agreement to writing. Adv. Dkt. 66 at 184:22–185:2. According to Defendant, the parties did not discuss whether there would be any use restrictions on the funds Plaintiff advanced for use by El Patron LLC, such as whether Defendant could be paid a salary from the company. *Id*. at 276–77; *see also* Adv. Dkt. 65 at 27 (Plaintiff's testimony, "Q. Did you ever talk to [Defendant] about his salary and his wages? A. No, sir, never.").

Notably, Plaintiff began making advances to Defendant *before* either the December 2021 dinner or the subsequent business presentation. On November 2, 2021, Plaintiff gave $20,000 to Defendant via a cashier's check payable to him personally. Adv. Dkt. 62-1 at 59 (top left photo, cashier's check no. 0069112511). On November 23, 2021, Plaintiff gave $60,000 to Defendant via a cashier's check

---

[10] Although the Court was shown Option B at trial, and the Court identified it as Impeachment Exhibit C, no party moved to admit that exhibit into evidence. *See* Adv. Dkt. 66 at 174–75. Nevertheless, a copy of Option B/Impeachment Exhibit C appears in Defendant's answer to Plaintiff's second amended complaint. *See* Adv. Dkt. 46 at 145.

payable to him personally. Adv. Dkt. 62-1 at 59 (top right photo, cashier's check no. 0069112546).[11] At trial, Plaintiff confirmed he received the presentation only *after* he had begun giving money to Defendant. Adv. Dkt. 65 at 71:13–72:22. In his words, Plaintiff received the presentation "[s]omewhere in the middle" of his various advances of funds. *Id*. at 72:14; *see also* Adv. Dkt. 65 at 72:1–22 (Plaintiff testifying that prior to the business presentation, Defendant had already "started making excuses" as to why the business had not yet generated returns).

Nevertheless, after the presentation, Plaintiff made more advances. On January 5, 2022, for instance, Plaintiff and Defendant visited a local branch of Plaintiff's bank. Adv. Dkt. 65 at 28:2–8, 63:6–12. While there, Plaintiff purchased a cashier's check in the amount of $120,000 and handed it to Defendant then and there. *Id*.; Adv. Dkt. 62-1 at 59 (bottom left photo, cashier's check no. 0069110255). The cashier's check was payable to Defendant personally. *Id*. According to Defendant, all the money Plaintiff gave him went to El Patron LLC. Adv. Dkt. 66 at 277–78. Remarkably, Plaintiff testified that Defendant never made any "oral representations that he was going to pay [Plaintiff] back." Adv. Dkt. 65 at 29–30.

In April of 2022, Defendant began receiving threatening correspondence from Anand, an early investor (or lender) to the business. Adv. Dkt. 65 at 40–41, 44–45; Adv. Dkt. 62-2 at 118 (text messages from Anand to Defendant stating, "Money is due today," "75 K," "I am not gonna [*sic*] call again bro," and "I'll be knocking doors soon."). Defendant turned to Plaintiff for help. According to Plaintiff, Defendant needed help repaying Anand because the threats were preventing Defendant from "concentrat[ing] in [*sic*] the business." Adv. Dkt. 65 at 42–46.

On April 20, 2022, Plaintiff and Defendant together visited the Northridge branch of Wells Fargo, where Plaintiff maintained an account. Adv. Dkt. 65 at 82; Adv. Dkt. 62-2 at 119. Plaintiff purchased a cashier's check payable to "Raunaq Anand" in the amount of $72,500, and immediately "gave it to" Defendant. Adv. Dkt. 65 at 82. That same day, Defendant had the cashier's check personally delivered to Anand. *See* Adv. Dkt. 62-3 at 42 (messages to Plaintiff from Defendant,

---

[11] This advance was substantially repaid shortly thereafter. On December 6, 2021, Defendant repaid Plaintiff $58,000. Adv. Dkt. 62-4 at 2, 6, 7. The circumstances surrounding this advance and prompt repayment are unclear from the record.

disclosing address in Pico-Robertson area of Los Angeles, followed by photo of man extending his arm through passenger door window of vehicle and towards driver).[12]

In addition to the cashier's checks identified above (i.e., $20,000, $60,000, $120,000, and $72,500), Plaintiff testified that he gave additional cashier's checks to Defendant as advances for El Patron LLC, but did not produce them at trial. *See* Adv. Dkt. 65 at 54:16–17 (Plaintiff's testimony that "It's [*sic*] supposed to be more checks."), 95:20–22 (Plaintiff's testimony that "I don't have the copies of all the other [checks] because the cashier check [*sic*] have been very hard to trace."); *see also id*. at 54:18–20 (Plaintiff's counsel indicating that, although other checks allegedly exist, these are "what we have;" they were the only ones Plaintiff was "able to get from [Defendant]."). [13] Thus, although Plaintiff argued at trial that Defendant owes him a total of $325,000, the Court has only seen and heard credible evidence of an outstanding debt totaling $214,500 (i.e., $20,000 check + $60,000 check + $120,000 check + $72,500 check - $58,000 repayment).[14]

Moreover, the Court finds as a general matter that Plaintiff's testimony regarding his dealings with Defendant were frequently inconsistent, unreliable and lacking in credibility. For instance, Plaintiff testified that his conversation with Defendant about the need to pay off Anand occurred at the end of October of 2022. Adv. Dkt. 65 at 43. This is directly contradicted by the date of the cashier's check to pay Anand: April 20, 2022. Adv. Dkt. 62-2 at 119. Likewise, Plaintiff initially testified that the purpose of this advance was to fund the business (i.e., stating that Defendant represented it would be used only for that purpose). Adv. Dkt. 65 at 46. Upon further inquiry, however, Plaintiff changed his story, acknowledging that the funds were used to pay off Anand and the amount added to the loan balance

---

[12] Plaintiff testified that he did not recall receiving these messages. Adv. Dkt. 65 at 80-81. The Court finds Plaintiff's lack of recollection to be not credible.

[13] Notably, Plaintiff never filed a motion to compel compliance with any subpoena duces tecum he served, or to compel responses to any requests for discovery, whether propounded on his own bank, on Defendant, or on any other entity. *See* Adv. Dkt. 50 (order setting Dec. 31, 2025, as discovery cutoff). Moreover, Plaintiff's proposed pretrial stipulation indicated "that there are no outstanding discovery disputes." Adv. Dkt. 52 at 6:22–23. Moreover, at the beginning of trial, Plaintiff testified on direct examination that "[f]rom the top of [his] head," he sent checks to Defendant for the business "about three or four times" only, each of which were in the form of a cashier's check. Adv. Dkt. 65 at 28:12–17.

[14] Ultimately, the precise amount is inconsequential because the Court concludes that any debt arising from Plaintiff's advances is dischargeable.

owed by Defendant to Plaintiff. Adv. Dkt. 65 at 47. Similarly, Plaintiff testified that he gave the funds "personally to [Defendant]," Adv. Dkt. 65 at 46–47, but later acknowledged that he ordered the cashier's check payable to Anand only, *see* Adv. Dkt. 65 at 82–83; Adv. Dkt. 62-2 at 119 (copy of check payable to Raunaq Anand).

**F. El Patron LLC Leases a Second Facility**

On June 27, 2022, Defendant caused El Patron LLC to lease a second warehouse next to the Facility, Unit 300 at the Property (the "Second Facility"). *See* Adv. Dkt. 66 at 117, 300–01; *see also* Adv. Dkt. 46 at 2 (¶ 1), 91 ("Addendum No. 1" to lease for Second Facility). The Second Facility was completed and did not require a build-out by the company. Adv. Dkt. 66 at 304–05. It already had air conditioning, plumbing, electrical, drywall, interior walls and doors, and overall "was in good condition." Adv. Dkt. 66 at 305–06. Defendant never made tenant improvements at the Second Facility, such as installing growing racks and lights, and never cultivated cannabis there because he "was waiting for the permits." Adv. Dkt. 66 at 299, 306–07. The only expenses the company incurred for the Second Facility were the rent and some power bills. *Id*. at 307.

**G. The First Harvest Is Mostly Unsuccessful**

In September of 2022, Defendant caused El Patron LLC to purchase 930 clones (i.e., propagated cuttings of cannabis plants) from VBF Brands, Inc. using cash. Adv. Dkt. 62-2 at 177 (invoice for clones of following cannabis strains: Slurty3, SFV OG, Gelato 41, High Society and Baccio Mintz). In August and September of 2022, Defendant or his sister, Lina, caused the business to make two other wire transfers from its deposit account at Wells Fargo, purportedly for more clones. *See* Adv. Dkt. 62-2 at 178–79. By December of 2022, El Patron LLC had purchased 1,920 clones, spread across five out of the seven grow rooms. Adv. Dkt. 62-2 at 187 (company's plant inventory dated Dec. 2022). On January 11, 2023, the company purchased another 50 clones of Blank Runtz strain. Adv. Dkt. 62-2 at 180. Each plant was inventoried by a blue RFID tag provided by the State. *See* Adv. Dkt. 65 at 201–03; Adv. Dkt. 62-2 at 181, 188–91 (photos of tags).

To prune and take care of the plants, El Patron LLC employed an average of three laborers as needed. Adv. Dkt. 66 at 64–65, 253; Adv. Dkt. 62-2 at 194 (second photo in composite, depicting two laborers pruning plants). Defendant testified that he still "had to be close to … them," as he was

ultimately responsible for the company's operations and "ha[d] to know everything about cultivation." Adv. Dkt. 66 at 253. Defendant also hired Mendoza to do some cleanup and maintenance work. *Id*. at 115.

Of the approximately 2,000 plants comprising El Patron LLC's first cultivation at the Facility, only about 100 survived. Adv. Dkt. 66 at 95, 243. Most of the first crop was decimated by pests. *Id*. at 242. In January of 2023, El Patron LLC performed its first harvest, reaping only thirty pounds of dried, sellable cannabis flower. Adv. Dkt. 66 at 94, 230, 243; Adv. Dkt. 62-2 at 197–98 (composites of photos of harvest process). On January 30, 2023, Defendant caused El Patron LLC to sell that product to Herbal Remedies Caregivers, Inc. for $18,236.77. Adv. Dkt. 66 at 231; Adv. Dkt. 62-2 at 202 (invoice); *see also* Adv. Dkt. 62-2 at 200–01 (purchaser's cannabis distribution license), 203–04 (cannabis transfer form and transportation manifest).

**H. <u>Business Operations Falter and Ultimately Cease</u>**

After the first harvest failed in January of 2023, Defendant tried again with a second crop of 2,000 cannabis plants. Adv. Dkt. 66 at 85. On January 10, 2023, El Patron LLC purchased least 150 clones from VBF Brands, Inc. using cash. Adv. Dkt. 62-2 at 207 (invoice for 50 Black Runtz strain clones, 50 Pink Runtz strain clones, and 50 Gelato 41 strain clones).

The costs of running an indoor grow operation were much higher than Defendant anticipated; he testified the business was bleeding money left and right, and in his words, "was [going] crazy." Adv. Dkt. 66 at 248–56. To trim costs, Defendant stopped using laborers and began doing the cultivation work all by himself. *Id*. Although he had initially taken a monthly salary of approximately $4,000 per month from June of 2021 to April of 2022, for a total of around $40,000, he stopped because "there was no money," and he needed "to pay everybody first" before he could "care about [himself]." *Id*. at 279–80. To make matters worse, "everybody was expecting the first harvest to get the money back," which was an overwhelming failure. *Id*. In recalling this period in his life, Defendant stated "I was killing myself." *Id*. at 256.

When the second crop began, Defendant "was out of cash," "was illiquid," and could not pay the electricity bill. *Id*. at 249, 258. The business had only $3,000 on hand at the time. *Id*. at 258. In February or March of 2023, Defendant made arrangements with the Facility's electric utility provider,

Southern California Edison ("Edison"), to pay an $8,000 balance that had become past due. *Id.* at 255. Correa sent him $4,000 to help pay the power bill. *Id.* at 249. Defendant ultimately paid Edison $8,000, buying him more time "to try to get some money" to keep the lights on at the Facility. *Id.* at 256. When he did not come up with the money, Edison cut the power. *Id.*; *see also* Adv. Dkt. 62-2 at 225 (Edison disconnection notice dated Aug. 3, 2023). As a result, the grow lights and air conditioning turned off, marking the final chapter of El Patron LLC's time in operation. The power never went back on. Adv. Dkt. 66 at 245.

Defendant testified that in May or June of 2023, state inspectors visited the Facility. Adv. Dkt. 66 at 243–46. According to Defendant, the inspectors determined that the cannabis product was not safe "for human consumption" due to the humidity levels in the Facility, which were the result of the air conditioning system losing power. *Id.* The inspectors indicated that the company's product could not be harvested or sold, and they permanently shut down the grow operation. *Id.* Pursuant to the state's mandate, Defendant threw away all the plants from the company's second and final crop. *Id.*

El Patron LLC reported net losses on its tax returns for all three tax years that it was in operation. In tax year 2021, the company's losses exceeded $100,000. Adv. Dkt. 66 at 234. Its losses exceeded $200,000 in 2022. Adv. Dkt. 66 at 232–33. Finally, in 2023, the company reported around $800,000 in losses. *Id.* at 235–36. The tax preparer that Defendant used for his personal and the company's tax returns testified that "he ha[d] a lot of losses." *Id.* at 135.

**I. <u>Defendant Issues a Promissory Note to Plaintiff</u>**

On March 29, 2023, Defendant executed and notarized a promissory note in favor of Plaintiff.[15] Adv. Dkt. 62-1 at 2–8 (the "<u>Note</u>"). The Note stated that its purpose was to document Defendant's promise to "repay a loan proffered to him by [Plaintiff] on different dates and in different amounts which were completed in September 2022. This loan was in the amount of … $400,000[, and Defendant] was to use the loan for the creation and maintenance of El Patron LLC." *Id.* at 2. However, the Note also stated that Defendant owed Plaintiff $520,000, which debt would become fully matured on September

---

[15] The Note is somewhat ambiguous as to whether the party to be charged under the Note was Defendant or El Patron LLC. The Note states that, "[t]he undersigned, Giovanni Hernandez … a United States citizen, domiciled in Los Angeles, California, is the borrower in this agreement." Adv. Dkt. 62-1 at 2. However, Defendant signed the Note as "Giovanni Hernandez, EL PATRON, LLC." *Id.* at 7.

30, 2026, with monthly installments in various amounts due beginning June 15, 2023. *Id*. at 2–5. The Note indicated that it was secured by: (a) Defendant's ownership interest in El Patron LLC, and (b) Defendant's ownership interest "of a lot … located [on] Jamison Street, California City, California 93505," further identified by assessor's parcel number (APN) 302-080-24 in Kern County, California.[16] *Id*. at 2–3. Finally, the Note contained a unilateral attorney's fee provision, which stated that Defendant "will assume all legal costs and any other expenses that [Plaintiff] must incur to recover their [*sic*] money under this loan." *Id*. at 6. *But see* Cal. Civ. Code § 1717(a) (making reciprocal an otherwise unilateral contractual obligation to pay attorney's fees and costs).

Plaintiff initially testified that he signed the Note because Defendant sought relief from their agreed-upon interest rate. Adv. Dkt. 65 at 27:4–6 (Defendant "sa[id] the interest … was too much, and he needed the interest [to be] less," to which Plaintiff replied, "fine, no problem."). Plaintiff later testified that the Note was his idea. *Id*. at 29. Plaintiff asked Defendant for the Note "to make it … more firm," "to have a document that [*sic*] prove the business and the money that [Plaintiff] was giving to [Defendant]," and because Defendant had never said he would pay Plaintiff back. *Id*. at 29–30. Defendant testified that he had virtually no money at the time he signed the Note, Adv. Dkt. 66 at 258–

[16] Defendant's schedule A/B disclosed no legal or equitable interest in any residence, building, land or other real estate. Case Dkt. 1 at 10 (¶ 1). Plaintiff testified that Defendant previously purchased "a five-acre lot in California City" to "build another … cannabis" operation, which Defendant subsequently "lost … because he didn't have money to pay for it." Adv. Dkt. 66 at 325–26. The Court takes judicial notice of the Kern County Assessor Recorder's website, *see* Fed. R. Evid. 201(b)(2), (d), which indicates that the property identified by APN No. 302-080-24 is only 2.51 acres. *Assessor Property Search*, Kern Cty. Assessor Recorder, https://www.kerncounty.com/government/departments/assessor-recorder/property/assessor-property-search (Under "Search by," select "APN," and under "Search term," enter "302-080-24") (last visited June 21, 2026). However, the eastern parcel adjoining that lot, identified by APN No. 302-080-19, also is 2.51 acres, and it is only accessible from a public road (Jamison Street) by crossing the western lot. *See Assessor's Parcel Map*, Kern Cty. Assessor Recorder, https://assessorapps.kerncounty.com/PropertySearch/DocViewPages/DocViewAssessorMaps.aspx?apn=30208024 (last visited June 21, 2026). While it may be plausible that Defendant at some point had an ownership interest in real property, there is no credible evidence in the record of that. And even if he did, the record before the Court supports only that Plaintiff had, at best, an unperfected security interest in only half of the alleged acreage. *See* Cal. Civ. Code §§ 1213–1218 (providing that encumbrance of real property is unperfected if not duly recorded in county where property is situated).

59, and he received no new money from Plaintiff in connection with execution of the Note, *id*. at 263–64.[17]

**J. Plaintiff Visits the Property Unannounced, Begins Pressuring Defendant**

In the spring or summer of 2023, Plaintiff and his friend, Giraldo, visited the Property. Adv. Dkt. 65 at 24:18–26:18; Adv. Dkt. 66 at 33–34. Together, they made the long drive from The Liora in Northridge to the Property in California City. Adv. Dkt. 66 at 41:13–18. This time, unlike Plaintiff's original visit to Defendant's operation, Plaintiff visited without Defendant having invited him. Adv. Dkt. 65 at 24:20–21. Plaintiff arrived unannounced because, according to him, Defendant "never told [him] anything," including whether any product had been sold. *Id*. at 24:18. Giraldo testified that the purpose of the visit was to verify if El Patron LLC was still operating at the Facility "because [Plaintiff] told [Giraldo] that he was having money problems with [Defendant];" specifically, "some money had been lost with El Patron LLC." Adv. Dkt. 66 at 11.

When they arrived, Plaintiff and Giraldo were unable to go inside the Facility. Adv. Dkt. 66 at 29–30. The Facility was enclosed by a fence that "was about 30 or 40 feet" from its exterior walls. *Id*. at 27–28. They could not see inside because "there wasn't a single" window into the Facility. *Id*. at 30:7. They saw what appeared to be "dead marijuana plants that had been tossed next to the fence" at the far end of the Property, but "they were too far away" to see clearly. *Id*. at 26:10–12, 27–28, 30:13.

Giraldo also testified that around this time, he observed Plaintiff "pressuring [Defendant] because [Plaintiff] wanted to see results" from the operation and "for his investment." Adv. Dkt. 66 at 35–39. Plaintiff testified that he began calling Defendant and asking for his money back. Adv. Dkt. 65 at 31. In general, Plaintiff stated he was upset because Defendant appeared to "think[] he was God and … capable of doing everything with money that wasn't [*sic*] belong to him." Adv. Dkt. 66 at 326:8–10. Giraldo testified that when he ran into Defendant at The Liora, Defendant appeared noticeably "overwhelmed" and in a "poor disposition." Adv. Dkt. 66 at 35–39. Giraldo believed that Defendant

[17] It is not clear to the Court whether Plaintiff's advances were originally intended as an equity investment rather than a loan, and, if the former, whether the note transformed the nature of the obligation to a debt. Neither of the parties addressed the issue at trial. Nevertheless, adjudication of those issues is not necessary. Assuming for the sake of analysis that the advances constitute a debt, the Court concludes below that such debt is not dischargeable.

"was very concerned because he wanted to give [Plaintiff] some results, some kind of statement or something to show [Plaintiff] that the business was going well." *Id*.

**K. Plaintiff Learns of An Alleged Threat by Defendant, Seeks Restraining Order**

Plaintiff testified that, in 2023, he obtained a restraining order against Defendant based on a threat Defendant allegedly made, outside of Plaintiff's presence, to physically harm Plaintiff or have him physically harmed.

In an effort to demonstrate at trial that Defendant made this threat, Plaintiff offered his own testimony and that of Correa. According to Plaintiff, Correa told him that "[Defendant] called someone in his presence saying that [Defendant] 'had a nail in his shoe, and he needed to get rid of him.'" Adv. Dkt. 65 at 33–34. Plaintiff understood this to mean that Defendant wanted to "get[] rid of" or "kill" him. Adv. Dkt. 65 at 35:15–20. When Plaintiff heard this, he "got … very, very afraid" because he believed his "life was in threat," especially considering that he was learning of this threat from Correa, someone Plaintiff had "never met … in the past" and who "didn't know nothing [*sic*] about [Plaintiff]." Adv. Dkt. 65 at 36:2–8. Plaintiff thereafter called Defendant's sister, Lina, and "told her all about the threat." Adv. Dkt. 66 at 325. Plaintiff acknowledged at trial that he has no recording of Defendant making any threat, Adv. Dkt. 65 at 60, has no text message of Defendant making any threat, *id.* at 61, and that Defendant never committed any violent act against him, *id.* at 61.

Correa initially testified at trial that he was present, somewhere in Los Angeles County, with Defendant and Mendoza, when Defendant "called a guy in Mexico City, … his partner" and said "'Bro, help me get this rock from off of my shoe that is digging into me.'" *Id*. at 172:3–4. After a beat, Defendant's next words allegedly were, "'Take this stone from off my shoe. But not here where I live. Do it where you live,' meaning in … Tijuana," a city Correa knows Plaintiff to frequent for medical treatments. Adv. Dkt. 172:6–8, 172:12–14. Correa understood Defendant's statements to be a threat of physical violence against Plaintiff, stating that Defendant had "dark intentions." Adv. Dkt. 65 at 172:15, 175:10–13. Correa testified that he does not have a recording of any threat made by Defendant. Adv. Dkt. 65 at 213–14.

Near the conclusion of his testimony, however, Correa acknowledged that he "found all this out through [Mr. Mendoza], starting with the … death threats that [Defendant] made towards [Plaintiff]."

Adv. Dkt. 65 at 172:20–22. In other words, Correa recanted his testimony that he had personally heard Defendant make a threat towards Plaintiff. For this reason, the Court finds that the entirety of Correa's testimony about Defendant's alleged threats is inadmissible hearsay. *See* Fed. R. Evid. 801; *see also* Adv. Dkt. 65 at 172–73 ("THE COURT: … the portion of the testimony where [Correa] refers to things that [Mr. Mendoza] may have told him is hearsay and not particularly helpful. … MR. DRAKE: No problem."). And even if not inadmissible hearsay, the Court finds (i) Correa lacked personal knowledge of Defendant's alleged phone call, s*ee* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."), and (ii) his testimony regarding the phone call otherwise lacks credibility or any indicia of reliability.[18]

### L. <u>Plaintiff Files State Court Lawsuit Against Defendant</u>

On November 8, 2023, Plaintiff filed a complaint against El Patron LLC and Defendant in the Los Angeles Superior Court, initiating a civil action entitled *Hernandez v. El Patron LLC, et al.*, Case No. 23STCV27391 ("<u>State Court Action</u>"). Adv. Dkt. 62-1 at 18–37 ("<u>State Court Complaint</u>"); *see, e.g.*, *Rosales-Martinez v. Palmer*, 753 F.3d 890, 894 (9th Cir. 2014) ("It is well established that we may take judicial notice of judicial proceedings in other courts."). In the State Court Complaint, Plaintiff sought damages and equitable relief under the following causes of action: (1) breach of written contract; (2) common count: money lent; (3) breach of implied in fact contract; (4) breach of implied covenant of good faith and fair dealing; (5) fraud & deceit: false promise; (6) unjust enrichment; and (7) promissory estoppel. *Id*. On November 13, 2023, the Los Angeles Superior Court issued a summons in the State Court Action.[19] Adv. Dkt. 62-1 at 10.

---

[18] When questioned by Plaintiff's counsel, Mendoza (the source of the alleged hearsay), testified that he "didn't hear" any threats made by Defendant towards Plaintiff about repayment of the debt at any time. Adv. Dkt. 66 at 109:8–11. The Court found Mendoza's testimony credible. Mendoza's testimony corroborated Defendant's testimony, which the Court also finds credible, that the alleged phone call and threat never occurred. Dkt. 66 at 264–66.

[19]The record contains no proof of service of this summons on Defendant. However, in a declaration of Plaintiff's counsel filed on May 8, 2024, in support of Plaintiff's motion for relief from the automatic stay, counsel indicated that a trial or hearing was scheduled to begin on May 16, 2024. Case Dkt. 14 at 6 (¶ 5.d).

### M. Defendant Files Bankruptcy, Plaintiff Files Nondischargeability Complaint

Towards the end of 2023 or beginning of 2024, Defendant moved out of his apartment at The Liora, purportedly for nonpayment of rent. Adv Dkt. 66 at 62; *see also* Case Dkt. 1 at 22 (¶4.13 of Schedule E/F, disclosing a debt to Plaintiff for "rent" in scheduled amount of $10,075, and indicating an unlawful detainer or eviction proceeding had been initiated against him under LASC No. 23CHSC00753). Mendoza stayed in the complex, where he still lives today with two other friends. Adv. Dkt. 66 at 62.

#### 1. Defendant's Chapter 7 Bankruptcy Case

On April 1, 2024, Defendant filed a chapter 7 petition with this Court, initiating his bankruptcy case. Case Dkt. 1. As of that date, Defendant had no assets of value which he did not claim as exempt under California law. *Id*. at 10–16 (Schedules A/B and C). Defendant's primary assets were less than $1,500 in cash and deposits of money, personal belongings such as clothes and household furnishings, and a car that was almost entirely encumbered by the auto finance company's secured loan.[20] *Id*. at 10–17.

In his Schedule E/F, Defendant disclosed the following unsecured business debts: a debt to Plaintiff in the scheduled amount of $400,000, arising out of the State Court Action, *id*. at 22 (¶ 4.12); a debt to Correa in the amount of $369,750 for money loaned, *id*. at 22 (¶ 4.11); a debt to Toledo in the amount of $112,250 for money loaned, *id*. at 19 (¶ 4.3); a debt in the amount of $70,000 in rent owed on the Facility, which he guaranteed, *id*. at 18 (¶ 4.1); a debt to Edison in the amount of $24,757.37 for utilities at the Facility, *id*. at 23 (¶ 4.16); and a debt of an unknown amount potentially owed on a wage claim that laborer Maria Chavez filed against him and the company, pending with the California Department of Industrial Relations under Case No. WC-CM-931439, *id*. at 24 (¶ 4.17).

Even though the Court issued a notice indicating that "[n]o property appears to be available to pay creditors" and stating, "please do not file a proof of claim now," Case Dkt. 7 at 2 (¶ 10), Plaintiff filed a claim, *see* Proof of Claim No. 1-1. Plaintiff's proof of claim asserts an unsecured debt in the

[20] Defendant apparently lost this car after filing bankruptcy. *See* Adv. Dkt. 34 at 2:8–9 (Defendant's former counsel's motion to withdraw, stating "Defendant is 'judgment proof' to the extent that he has no assets and not even a car.").

amount of $604,931.51, which is comprised of the principal under the Note, a $60,000 contractual penalty for defaulting under the Note, and interest calculated using the "default pre-judgment interest rate" of 7% under California law. *Id*.

On May 8, 2024, Plaintiff filed a motion for relief from the automatic stay to proceed with the State Court Action. Case Dkt. 14. On July 12, 2024, the Court held a hearing in which it granted Plaintiff's stay relief motion as unopposed, permitting Plaintiff to proceed to final judgment in the State Court Action. Case Dkt. 28 (minute entry after hearing).[21]

On May 13, 2024, the chapter 7 trustee filed a *Report of No Distribution*, indicating that after making "a diligent inquiry into the financial affairs of" Defendant, she determined "there is no property available for distribution from the estate over and above that exempted by law." Case Dkt. 17.

**2. The Adversary Proceeding**

On July 5, 2024, Plaintiff filed a nondischargeability complaint against Defendant, initiating this adversary proceeding. Adv. Dkt. 1 ("Complaint"). On September 17, 2024, after a hearing on Defendant's motion to dismiss the Complaint, the Court dismissed Plaintiff's claims under sections 523(a)(4) and (6), and 727(a)(2) with leave to amend. Adv. Dkt. 12.

On October 12, 2024, Plaintiff filed a first amended complaint against Defendant. Adv. Dkt. 15 ("FAC"). On January 17, 2025, after a hearing on Defendant's motion to dismiss the FAC, the Court dismissed Plaintiff's claims under sections 523(a)(4) and (6) with leave to amend, and dismissed Plaintiff's claim under section 727(a) "with prejudice." Adv. Dkt. 36 (emphasis in original).

On June 13, 2025, Plaintiff filed a second amended complaint. Adv. Dkt. 43 ("SAC"). In the SAC, Plaintiff alleged causes of action under sections 523(a)(2)(A), (4) and (6). *Id*. at 5–11.[22] On September 26, 2025, Defendant filed an answer to the SAC. Adv. Dkt. 46.

---

[21] Plaintiff's counsel never lodged a proposed order memorializing the Court's ruling. *See* Local Bankr. R. 9021-1(b)(1)(A) (providing that attorney for prevailing party must prepare proposed order).

[22] The SAC is erroneously captioned *"Second Amended Adversary Complaint Objecting to Entry of Discharge Pursuant to 11 U.S.C. §§ 727(a) and (c)*," Adv. Dkt. 43 at 1. The SAC further impermissibly states that "Plaintiff … objects to the entry of discharge in [Defendant's] bankruptcy case pursuant to [section] 727(a)(4)," *id*. at 1:18–21, and it impermissibly alleges that "Defendant is not eligible for discharge … pursuant to [section] 727(a)(2)," *id*. at 2:1–2. Consistent with the Court's prior ruling dismissing Plaintiff's section 727 claim with prejudice, the Court has disregarded these references. The only claims considered at trial were those arising from Bankruptcy Code section 523.

From at least August 12, 2024, Defendant was represented by attorney Sevan Gorginian. *See* Adv. Dkt. 6 (Defendant's motion to dismiss Complaint). On February 7, 2025, the Court entered an order granting Gorginian's motion to be relieved as counsel of record to Defendant due to unpaid legal fees. Adv. Dkt. 40 (order); Adv. Dkt. 34 (motion). Thereafter, Defendant, who is not a lawyer or even a native English speaker, defended himself in this adversary proceeding, throughout discovery, at his deposition, and at trial.

## IV. <u>ANALYSIS</u>

In a nondischargeability action under section 523(a) of the Bankruptcy Code, the creditor-plaintiff has the burden of proving all the elements of its claim by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991); *see also* Fed. R. Evid. 301 ("In a civil case, … the party against whom a presumption is directed has the burden of producing evidence to rebut the presumption."). Exceptions to discharge are strictly construed against the creditor and in favor of the debtor to effectuate the fresh start policies under the Bankruptcy Code. *Snoke v. Riso (In re Riso)*, 978 F.2d 1151, 1154 (9th Cir. 1992).

The theme of Plaintiff's trial presentation was to suggest that Defendant did not establish a legitimate business, was incompetent in that effort, was dishonest in his business dealings, and that he improperly diverted the funds of El Patron LLC for personal purposes. Plaintiff not only failed to persuade the Court of these premises, but missed the mark in terms of the applicable legal standards for his claims. The nondischargeability of debts is governed by Bankruptcy Code section 523(a). Plaintiff's evidentiary presentation barely addressed the legal elements required by the statute, let alone met his burden to show that each of these elements was satisfied.

After two days of trial testimony, the Court is left with the firm conviction that Defendant used the money he received from Plaintiff (and raised from others) to start a legitimate and legally permitted cannabis growing operation that failed despite his sincere, best efforts. The fact that the business failed, that Defendant was at the helm, and that there may be unresolved questions as to precisely why it failed, are not sufficient to satisfy the Plaintiff's burden. It was up to the Plaintiff to show, by a preponderance of the evidence, that the requirements for nondischargeability under Bankruptcy Code sections 523(a)(2), (a)(4) or (a)(6) were met. Plaintiff failed to do so.

**N. <u>False Representation, False Pretenses or Actual Fraud Under Section 523(a)(2)(A)</u>**

Section 523(a)(2)(A) of the Bankruptcy Code provides that a chapter 7 discharge does not discharge an individual debtor from any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by … false pretenses, a false representation, or actual fraud…." 11 U.S.C. § 523(a)(2)(A). "A false representation is an express misrepresentation, while a false pretense refers to an implied misrepresentation or conduct intended to create and foster a false impression." *Reingold v. Shaffer (In re Reingold)*, 2013 WL 1136546, at *3 n.4 (B.A.P. 9th Cir. Mar. 19, 2013) (citing *In re Young*, 91 F.3d 1367, 1374 (10th Cir. 1996)); *see Shannon v. Russell (In re Russell)*, 203 B.R. 303, 312 (Bankr. S.D. Cal. 1996).

To prevail on a section 523(a)(2)(A) claim concerning a false pretense or false representation, a plaintiff must prove by a preponderance of the evidence the following five elements:

> (1) misrepresentation, fraudulent omission or deceptive conduct by the debtor; (2) knowledge of the falsity or deceptiveness of the [their] statement or conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor on the debtor's statement or conduct; and (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct.

*Oney v. Weinberg (In re Weinberg)*, 410 B.R. 19, 35 (B.A.P. 9th Cir. 2009) (quoting *Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman)*, 234 F.3d 1081, 1085 (9th Cir. 2000)). Representations made without an intent to perform may satisfy the first three requirements of section 523(a)(2)(A). *Rubin v. West (In re Rubin)*, 875 F.2d 755, 759 (9th Cir. 1989). Because intent is difficult to prove through direct evidence, it "'may be established by circumstantial evidence, or by inferences drawn from a course of conduct.' Therefore, in determining whether the debtor had no intention to perform, a court may look to all the surrounding facts and circumstances…." *Id*. at 607 (internal citations omitted) (quoting *In re Devers*, 759 F.2d 751, 753–54 (9th Cir. 1985)); *see also Citibank (S.D.), N.A. v. Eashai (In re Eashai)*, 87 F.3d 1082, 1087 (9th Cir. 1996) ("[A] court may infer the existence of the debtor's intent … if the facts and circumstances of a particular case present a picture of deceptive conduct by the debtor.").

At the outset, Plaintiff has presented no credible evidence at trial that Defendant made any "false representations" to Plaintiff prior to any of the advances, induced Plaintiff's advances under "false pretenses," or committed any other actual fraud. To the contrary, based on all of the facts and

circumstances adduced at trial, the Court is persuaded that Defendant sought, obtained and used the money he borrowed from Plaintiff for the intended purposes of establishing and operating El Patron LLC. That one of Plaintiff's advances was used to retire Defendant's debt to Anand is unpersuasive. The purpose of his advance was expressly disclosed by Defendant and agreed to by Plaintiff. Moreover, retirement of the debt owing to Anand was clearly related to the needs and business objectives of El Patron LLC.

Meanwhile, the fact that Defendant caused El Patron LLC to pay himself a salary for a period of time, or cover business related expenses is likewise unavailing. The Court concludes that this did not breach any representation made by Defendant, let alone a representation made at the time with knowing falsity and an intent to deceive. As noted, the Court did not find credible Plaintiff's testimony claiming that Defendant represented to him that El Patron LLC would not compensate Defendant, but did find credible Defendant's testimony to the contrary.

Moreover, the fact that Defendant executed the Note to memorialize Plaintiff's advances does not remedy these infirmities but rather underscores another hole in his case. Plaintiff argues that Defendant signed the Note with neither an intent nor an ability to make good on his commitments. But the argument fails. Plaintiff could not have been damaged by reliance on any promise or representation made in the Note because the funds had long since been advanced by Plaintiff. At the time the Note was executed, moreover, Plaintiff knew that El Patron LLC was struggling operationally and financially. The Court is persuaded that this is precisely why Plaintiff asked Defendant to execute the Note. Thus, even if Defendant misrepresented his ability to perform (which was not established), any reliance by Plaintiff would not have been justified under the circumstances.[23]

---

[23] In an apparent effort to impugn Defendant's character and suggest wrongdoing, Plaintiff testified during rebuttal that, in or around 2005, Defendant left Los Angeles for Colombia because "the police or FBI was looking for" Defendant after he purportedly had "taken $300,000 from a lady for real estate." Adv. Dkt. 66 at 320–21. Curiously, Plaintiff also testified that he "personally visited [Defendant] in Colombia" "[a]bout 10, 12 times" "between 2010 and 2020." Adv. Dkt. 65 at 319. But none of this testimony satisfies any element of Bankruptcy Code section 523(a)(2). Indeed, if Plaintiff's testimony is believed, and he was aware of serious allegations of fraud against Defendant in connection with another transaction, reliance on any representation by Defendant in connection with Plaintiff's advances would not have been justified.

Because Plaintiff failed to establish the elements of his cause of action under section 523(a)(2)(A), the Court will enter judgment thereon against Plaintiff and in favor of Defendant.

**O. Embezzlement or Defalcation Under Section 523(a)(4)**

Section 523(a)(4) of the Bankruptcy Code excepts from discharge debts for embezzlement, fraud or defalcation while acting in a fiduciary capacity, and larceny.

Federal law controls the definition of "embezzlement" in section 523(a)(4). *First Del. Life Ins. Co. v. Wada (In re Wada)*, 210 B.R. 572, 576 (B.A.P. 9th Cir. 1997). "Embezzlement is defined as 'the fraudulent appropriation of property by a person to whom such property has been [e]ntrusted or into whose hands it has lawfully come.'" *Id.* (quoting *Moore v. United States*, 160 U.S. 268, 269 (1895)). To prevail on a claim for embezzlement, the proponent must prove that: (1) the proponent entrusted its property to a nonowner; (2) the nonowner appropriated the property to a use other than that for which it was entrusted; and (3) the circumstances indicate fraud. *See Transamerica Com. Fin. Corp. v. Littleton (In re Littleton)*, 942 F.2d 551, 555 (9th Cir. 1991); *Peltier v. Van Loo Fiduciary Servs., LLC (In re Peltier)*, 643 B.R. 349, 360 (B.A.P. 9th Cir. 2022).

The statute also excepts from discharge debts for "fraud or defalcation while acting in a fiduciary capacity." 11 U.S.C. § 523(a)(4). Whether a debtor is a fiduciary for the purposes of section 523(a)(4) is a question of federal law. *Lewis v. Scott (In re Lewis)*, 97 F.3d 1182, 1185 (9th Cir. 1996). "The broad, general definition of fiduciary—a relationship involving confidence, trust and good faith—is inapplicable in the dischargeability context." *Ragsdale v. Haller*, 780 F.2d 794, 796 (9th Cir. 1986). Instead, the fiduciary relationship must "arise from an express or technical trust that was imposed prior to the wrongdoing that caused the debt." *Plyam v. Precision Dev. (In re Plyam)*, 530 B.R. 456, 471 (B.A.P. 9th Cir. 2015) (citing *Ragsdale*, 780 F.2d at 796). "In other words, the fiduciary relationship must exist 'before the wrong and without reference to it.'" *Uriostegui v. Dowling (In re Uriostegui)*, 669 B.R. 49, 54 (B.A.P. 9th Cir. 2025) (quoting *Ragsdale*, 780 F.2d at 796). However, state law determines whether the requisite trust relationship exists. *See Lewis*, 97 F.3d at 1185; *Mele v. Mele (In re Mele)*, 501 B.R. 357, 363–64 (B.A.P. 9th Cir. 2013).

Finally, the statute excepts from discharge debts for "larceny." 11 U.S.C. § 523(a)(4). Bankruptcy courts look to the federal common law to define larceny for purposes of section 523(a)(4).

*In re Quinones*, 537 B.R. 942 (Bankr. N.D. Cal. 2015) (citing *In re Ormsby*, 591 F.3d 1199, 1206 (9th Cir. 2010). Federal common law defines larceny as a "felonious taking of another's personal property with intent to convert it or deprive the owner of the same." *Id.* (citing *In re Ormsby*, 591 F.3d at 1206). "Larceny is distinguished from embezzlement in that the original taking of the property was unlawful." *In re Montes*, 177 B.R. 325, 332 (Bankr. C.D. Cal. 1994).

Plaintiff does not argue—and could not establish—either a fraud or defalcation while acting in a fiduciary capacity, or larceny. The former is not available because Plaintiff failed to demonstrate the existence of a fiduciary relationship between Plaintiff and Defendant arising from an express or technical trust. The two parties clearly had a debtor-creditor relationship but not a fiduciary relationship, as contemplated by the statute and caselaw. Meanwhile, larceny is not a viable claim because there is no evidence that Defendant feloniously took any property belonging to Plaintiff. To the contrary, the record establishes that Plaintiff voluntarily advanced funds to Defendant for his use in operating El Patron LLC.

Plaintiff's principal argument is that Defendant misappropriated funds that Plaintiff entrusted to him for the operation of El Patron LLC. This sounds closest to a claim for embezzlement, but the record does not support such a claim. The evidence uniformly shows that Plaintiff did not "entrust" funds to Defendant "as a nonowner" of the funds. Instead, it shows that Plaintiff voluntarily advanced funds to Defendant. Specifically, every cashier's check Plaintiff made for El Patron LLC (with the exception of the Anand check) was made payable to Defendant personally. Notwithstanding the parties' mutual intent that Defendant use these funds in connection with El Patron LLC (which he did), Defendant became the owner of the funds upon transfer. Defendant could not embezzle the funds from himself. To the extent Plaintiff suggests that El Patron LLC was the owner of the funds, any claim for embezzlement would belong to El Patron, LLC, not Plaintiff.

Moreover, Plaintiff failed to demonstrate that Defendant "appropriated the property to a use other than that for which it was entrusted." As for this element, Plaintiff's counsel argued during closing that "Defendant conceded in his sworn testimony" that he diverted funds from the company for his

personal use.[24] Adv. Dkt. 67 at 40–41. But Defendant's testimony was precisely the opposite:

> THE COURT: Did you keep for your personal use any of the money that … Plaintiff … loaned to you?
>
> THE WITNESS: No, your Honor. …
>
> THE COURT: You're sure?
>
> THE WITNESS: Yes.
>
> THE COURT: It all went to the business?
>
> THE WITNESS: Yes.

Adv. Dkt. 66 at 278; *see also id*. at 282–83 (during Plaintiff's cross-examination of Defendant, "THE COURT: … did you take any funds from the company, other than [your] salary…, for personal expenses? THE WITNESS: No, your Honor."). The Court finds Defendant's testimony on these points credible.[25]

Aside from the lack of testimonial evidence, the Court further notes Plaintiff failed to offer any documentary evidence that would establish improper use of any funds transferred to El Patron LLC. Plaintiff did not offer any bank statements or other financial records of El Patron LLC and did not use at

---

[24] Plaintiff's counsel apparently was referring to only a certain portion of Defendant's testimony. *See* Adv. Dkt. 66 at 221–22. That testimony simply does not hold the weight Plaintiff gives it. Plaintiff's counsel elicited this portion of testimony with vague, misleading questions that assumed facts not in evidence and mischaracterized prior testimony, making Defendant's alleged admissions entirely unhelpful to the Court. Defendant testified that because many checks for El Patron LLC were payable only to him personally, he would deposit them into his personal bank account and then transfer the funds to El Patron LLC's account. *Id*. He elsewhere credibly testified that, prior to him moving all banking services to Wells Fargo, El Patron LLC's bank would sometimes delay depositing the funds from his account. When fairly summarized in light of this context, Defendant's testimony was that if a hold occurred, he would not touch the funds pending transfer from his personal account, unless doing so would prevent him from timely paying wages owed to the company's employees. *See id*.

[25] In response to counsel's mischaracterization of the record during Plaintiff's closing arguments, the Court elaborated on why it had asked Defendant these questions:

> [T]he reason why I asked the clarifying question was that I thought that the record was not clear, and it came from a very … vague questioning on your part that didn't distinguish between [Plaintiff and the two other investors in El Patron LLC]. That's … why I asked the question clarifying about the funds that came from [Plaintiff]. [B]ut the transcript is what it is[,] and I'll take a look.

Adv. Dkt. 67 at 40–41.

trial (let alone question Defendant about) the financial records of El Patron LLC that Defendant put into evidence.

Because Plaintiff failed to establish the elements of his cause of action under section 523(a)(4), the Court will enter judgment thereon against Plaintiff and in favor of Defendant.

**P. Willful and Malicious Injury Under Section 523(a)(6)**

Section 523(a)(6) of the Bankruptcy Code provides that a chapter 7 discharge does not discharge an individual debtor from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). The "willful" and "malicious" requirements are conjunctive and subject to separate analysis. *Jett v. Sicroff (In re Sicroff)*, 401 F.3d 1101, 1105 (9th Cir. 2005); *see also Carrillo v. Su (In re Su)*, 290 F.3d 1140, 1146 (9th Cir. 2002) ("[T]he 'malicious' injury requirement of § 523(a)(6) is separate from the 'willful' requirement.").

A "willful" injury is a "deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998) (emphasis in original). Debts "arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)." *Id*. at 64. It suffices, however, if the debtor knew that harm to the creditor was "substantially certain to occur as a result of [the debtor's] conduct." *Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202, 1208 (9th Cir. 2001).

Maliciousness requires (1) a wrongful act; (2) done intentionally; (3) which necessarily causes injury; (4) without just cause or excuse. *Id*. at 1146–47. "[T]he 'done intentionally' element of a 'malicious' injury brings into play the same subjective standard of intent which focuses on the [tortfeasor]'s knowledge of harm to the creditor." *Thiara v. Spycher Bros. (In re Thiara)*, 285 B.R. 420, 434 (B.A.P. 9th Cir. 2002); *see also Jercich*, 238 F.3d at 1209. This definition "does *not* require a showing of biblical malice, i.e., personal hatred, spite, or ill-will." *Murray v. Bammer (In re Bammer)*, 131 F.3d 788, 791 (9th Cir. 1997) (emphasis in original).

When analyzing a claim under section 523(a)(6), courts look at: (1) whether the debtor's conduct was tortious under state law; and (2) whether the tortious conduct resulted in willful and malicious injury. *Jercich*, 238 F.3d at 1205–08. "[A]n intentional breach of contract cannot give rise to non-dischargeability under § 523(a)(6) unless it is accompanied by conduct that constitutes a tort under state

law." *Lockerby v. Sierra*, 535 F.3d 1038, 1040 (9th Cir. 2008); *see also Jercich*, 238 F.3d at 1206 ("[T]o be excepted from discharge under § 523(a)(6), a breach of contract must be accompanied by some form of 'tortious conduct' that gives rise to 'willful and malicious injury.' ... To determine whether [the debtor]'s conduct was tortious, we look to California state law.").

Plaintiff argued that Defendant's obligation for advances made by Plaintiff is nondischargeable because of the personal threat Defendant later made against Plaintiff. But this argument also fails. First, Plaintiff failed to persuade the Court that Defendant actually made a personal threat against him. Plaintiff's knowledge of the alleged threat was based on hearsay within hearsay, and the Court is not persuaded by the record that the threat, or even the phone call to a third party in which the threat allegedly was made, ever occurred. Second, Defendant's debt to Plaintiff did not arise from the alleged threat. Defendant's debt arose from Plaintiff's multiple loans to Defendant, which occurred long before the alleged threat occurred. Third, Plaintiff has failed to demonstrate any actual injury or compensable damage resulting from the alleged threat.[26]

Because Plaintiff failed to establish the elements of his cause of action under section 523(a)(6), the Court will enter judgment thereon against Plaintiff and in favor of Defendant.

## V. CONCLUSION

For the foregoing reasons, the Court will enter judgment in favor of Defendant and against Plaintiff on each of Plaintiff's claims under sections 523(a)(2), (4) and (6). The Court will prepare a judgment consistent with this memorandum.

Date: September 30, 2026

Martin R Barash
United States Bankruptcy Judge

[26] Because Plaintiff failed to demonstrate that any threat or resulting injury occurred, it is arguably unnecessary (and nonsensical) to address whatever intent Defendant may have had. Nevertheless, the Court notes that Plaintiff also failed to persuade the Court that if such a threat occurred, that Defendant had the requisite subjective intent to cause harm to Plaintiff.